# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARIO ERNESTO AMAYA,
JOSE NORLAND GONZALEZ and
JOSE AMADEO CASTILLO,

     Plaintiffs,

     v.

DGS CONSTRUCTION, LLC and
THE WHITING-TURNER CONTRACTING
COMPANY,

     Defendants.

Civil Action No. TDC-16-3350

## MEMORANDUM OPINION

Plaintiffs Mario Ernesto Amaya, Jose Norlan Gonzalez, and Jose Amadeo Castillo, former carpenters employed by Defendant DGS Construction, LLC, d/b/a Schuster Concrete Construction ("Schuster"), on the construction of the MGM Resort Casino at National Harbor in Prince George's County, Maryland, have brought suit against Schuster and Defendant The Whiting-Turner Contracting Company ("Whiting-Turner") for violations of the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. §§ 3-401 to 3-431 (West 2016), and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab & Empl. §§ 3-501 to 3-509, as well as for state law claims of breach of contract and unjust enrichment. Plaintiffs also seek a declaratory judgment that they are third-party beneficiaries of a Project Labor Agreement ("PLA") signed by Whiting-Turner and various trade unions. Plaintiffs allege that Schuster failed to pay Plaintiffs at the rate for carpenters for every hour worked and failed to pay certain fringe benefits for overtime work as required by the PLA. Pending before the Court

are Plaintiffs' Motion for Class Certification and Motion for Leave to Amend the Complaint. For the reasons set forth below, both Motions are granted.

## BACKGROUND

### I. Project Pay Requirements

Whiting-Turner served as the Project Contractor for the construction of the MGM Resort Casino at National Harbor ("the Project"). On April 30, 2014, Whiting-Turner and 16 trade unions entered into the PLA, which governed various aspects of the construction of the Project. The PLA defines the Signatories of the PLA as "all construction contractors and subcontractors of whatever tier engaged in onsite construction work within the scope of this Agreement that sign this Agreement or a letter of assent thereto." PLA ¶ 1.2, Motion for Class Certification ("MCC") Ex. 4, Joint Record ("J.R.") 46, ECF No. 118. The PLA further states that Whiting-Turner "shall require all contractors and subcontractors who have been awarded contracts for work covered by this Agreement" to execute a Letter of Assent binding them to the terms and conditions of the PLA "prior to commencing work." *Id.* ¶ 2.1.1, J.R. 48. In paragraph 12.5, the PLA also provides that:

> In the event that the Project Contractor or a Signatory does not receive at least three bids on any trade package from contractors or subcontractors that are qualified to perform the work identified in the trade package and have the business resources necessary to perform the work and which may also have been prequalified prior to bidding ("Qualified Contractor") and are signatories to a collective bargaining agreement with a Union with jurisdiction over the work to be performed, then that trade package shall be exempt from the requirements of this Agreement; provided, however that the Agreement shall apply if the lowest bidder on the trade package is a Qualified Contractor and is a signatory to such a collective bargaining agreement.

*Id.* ¶ 12.5, J.R. 61. The same provision, however, clarified that:

> Exemption from this Agreement shall not automatically relieve the successful bidder from complying with Project based requirements, such as, but not limited to, safety and quality programs. For all contractors working on the project,

2

payment of prevailing wages and fringe benefit rates of the project as indicated on the Maryland Department of Labor, Licensing, and Regulation Informational Wage Rate for Prince George's County determined at the commencement of the Project, which Developer has voluntarily adopted for the Project, shall be a minimum requirement and contractors are free to provide wages and fringe benefits at rates in excess of such prevailing rates.

*Id.*

On December 4, 2014, Schuster entered into an express contract with Whiting-Turner to perform concrete work on the Project. Since only one contractor with a signed collective bargaining agreement bid on the concrete contract, Schuster did not sign a Letter of Assent or similar document expressly agreeing to the terms of the PLA. However, as a subcontractor on the Project, Schuster was subject to the Whiting-Turner Project Manual, which established basic hourly rates and fringe benefit payments for various classifications of workers. For example, a "Carpenter" on the Project was required to receive a basic hourly rate of $26.81 and a fringe benefit payment of $8.19 per hour, while a "Laborer – Air Tool Operator" was required to receive an hourly payment of $19.92 and a fringe benefit of $2.94 per hour. J.R. 71. According to the Project Manual, these rates were derived from the Maryland Department of Labor Licensing and Regulation, Informational Wage Rates for Prince George's County.

Prior to June 10, 2015, every new Schuster employee on the Project was first placed in a "provisional" status upon hiring. J.R. 285. While in this provisional status, employees were paid at the hourly rate for the type of work that they performed. For example, if an individual performed two hours of work as a laborer on a particular day, and six hours as a carpenter, that individual would be paid for two hours of work as a laborer and six hours as a carpenter, regardless of skill or experience. During this provisional period, Schuster supervisors would evaluate the employee's skills and performance and recommend a permanent job title. Once the employee was approved for a permanent job title, the employee was paid at or above the

3

corresponding rate for all work. For example, if that same individual had a permanent title of carpenter and performed two hours of work as a laborer and six as a carpenter, that employee would be paid for eight hours as a carpenter.

According to Schuster, it paid its employees overtime pay for all hours worked in excess of 40 hours per work week. However, Schuster did not pay fringe benefits for these hours. Therefore, a carpenter would be paid $26.81 in hourly pay and $8.19 in fringe benefits for the first 40 hours worked each week, but $40.22 in hourly pay and no fringe benefits for each hour worked in excess of 40.

Schuster also maintained a system for auditing the hours worked by its employees on the Project. Schuster employees, known as "Work Reporters," distributed daily employee log sheets ("Daily EE Logs") to forepersons and other supervisors, with instructions to record the type of work performed by each employee and the duration of that work. J.R. 302. At the end of each day, employees were asked to sign the log, which contained the following statement, printed in English and Spanish: "[B]y signing, I am verifying the accuracy of hours worked outside my normal classification." *See, e.g.*, J.R. 472. According to Schuster, employees were directed not to sign the Daily EE Log if it was missing information or was incorrect, and were instead instructed to open a "trouble ticket" to document the request and track it to its resolution. J.R. 302-03. The record contains 16 of these trouble tickets, which generally show Schuster's efforts either to correct errors such as missing or misclassified work hours, or to explain to employees that they were paid properly for their work. For example, on June 22, 2015, a Schuster employee complained that he was missing carpentry hours for work he performed on walls and columns. According to the ticket, a Schuster supervisor spoke with the employee and explained that he did

not receive the carpenter rate for the work, which consisted of clamping together pre-fabricated panels, because it did not qualify as carpentry work.

## II.     Plaintiffs and the Proposed Class

Plaintiffs were each employed by Schuster during several months in 2015. Amaya began work on the Project as a provisional employee on May 11, 2015 and was upgraded to the job title of carpenter on June 15, 2015. While employed by Schuster, Amaya was paid as a carpenter for 952.39 hours and as a laborer for 23.73 hours.

Gonzalez began work on the Project on April 27, 2015 as a provisional employee and was upgraded to carpenter on June 29, 2015. On May 20, 2015, while he was still classified as a provisional employee, Gonzalez refused to sign his Daily EE Log because he did not agree with the classification of 2.25 hours of work as laborer work. Following an investigation, Schuster concluded that Gonzalez worked for two different crews that day, and that the time recorded under the laborer rate was actually spent as a carpenter. On July 2, 2015, Gonzalez was awarded $28.30 in retroactive pay for the misclassification. In total, Gonzalez was paid for 1,225 hours as a carpenter and 64.75 hours as a laborer.

Castillo began work on the Project on March 23, 2015 as a provisional employee and was upgraded to the title of carpenter on June 8, 2015. Overall, Castillo was paid for 324 hours as a carpenter and 5.5 hours as a laborer.

In identical affidavits, Amaya and Gonzalez state that Schuster regularly logged hours worked by carpenters as time worked as a laborer. Each further alleges that he was forced to sign documents stating that he had worked certain hours as a laborer, when in fact he had worked as a carpenter. All three Plaintiffs assert that they were told by Schuster supervisors that they

would not be paid if they did not sign the records, and that they sometimes were forced to sign records that were not filled out yet.

Plaintiffs have identified approximately 1,600 employees who allegedly were not paid overtime fringe benefits. They have further identified at least 388 employees who were classified as carpenters on the Project. Plaintiffs retained a certified public accountant to analyze the potential damages in lost wages and benefits owed to all construction employees employed by Schuster on the Project. According to the expert's report, carpenters employed on the Project were underpaid by approximately $4.35 million, based on (1) hours paid at the laborer rate when they should have been paid at the carpenter rate and (2) hours for which carpenters were otherwise not paid at the carpenter rate. The report further concludes that Schuster failed to pay its Project employees approximately $1.11 million in overtime fringe benefits.

## DISCUSSION

### I.     Motion for Class Certification

In their Motion for Class Certification, Plaintiffs seek certification of two classes. The "Overtime Fringe Benefit Class" is composed of "[a]ll current and former employees who were employed in any craft worker classification by Defendant Schuster at the MGM Resort Casino at National Harbor and worked overtime hours." MCC at 1, ECF No. 59. The "Carpenter Class" consists of "all current and former employees who were employed by Defendant Schuster at the MGM Resort Casino at National Harbor and performed carpentry work." *Id.* The Court will first discuss the legal standard for class certification, then consider each proposed class in turn.

### A.     Legal Standard

A class action allows representative parties to prosecute not only their own claims, but also the claims of other individuals which present similar issues. *Thorn v. Jefferson-Pilot Life*

*Ins. Co*, 445 F.3d 311, 318 (4th Cir. 2006). The use of a class action is primarily justified on the grounds of efficiency, because it advances judicial economy to resolve common issues affecting all class members in a single action. *Id.* Because of the need to protect the rights of absent plaintiffs to assert different claims and of defendants to assert facts and defenses specific to individual class members, courts must conduct a "rigorous analysis" of whether a proposed class action meets the requirements of Federal Rule of Civil Procedure 23 before certifying a class. *See id.* Courts have wide discretion to certify a class based on their familiarity with the issues and potential difficulties arising in class action litigation. *See, e.g. Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010). A plaintiff has the burden to show that all of the necessary prerequisites for a class action have been met. *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003).

The first of these prerequisites is that the class must exist and be "readily identifiable" or "ascertainable" by the court through "objective criteria." *EQT Prod. Co v. Adair,* 764 F.3d 347, 359-60 (4th Cir. 2014). While it is not necessary to identify every class member at the time of certification for a class to be "ascertainable," a class cannot be certified if its membership must be determined through "individualized fact-finding or mini-trials." *Id.* at 358. For example, in *EQT*, the court concluded that a proposed class of all individuals who owned an interest in a gas estate was not ascertainable because the actual owners could be determined only through an individualized review of land records. *Id.* at 359-60.

If a class is ascertainable, it must then satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy. To satisfy the numerosity requirement, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the assessment of this element, "numbers alone are not controlling," and a district

court should consider "all of the circumstances of the case" when deciding if this requirement has been met. *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976). The United States Court of Appeals for the Fourth Circuit has stated that 74 members is "well within the range appropriate for class certification," *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984), and has upheld the certification of a class with as few as 18 members, *Cypress v. Newport News Gen. and Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). However, the burden is on the plaintiffs to show that other class members exist and that their joinder is impracticable; a court may not rely on mere speculation that numerosity has been satisfied. *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356-57 (3d Cir. 2013); *Poindexter v. Teubert*, 462 F.2d 1096, 1097 (4th Cir. 1972).

Commonality requires that a class have "questions of law or fact common to the class" which are capable of classwide resolution, such that the determination of the truth or falsity of the common issue "will resolve an issue that is central to the validity of each one of the claims in one stroke." Fed. R. Civ. P. 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

As for typicality, the named plaintiff must be "typical" of the class, such that that the class representative's claim and defenses are "typical of the claims or defenses of the class" in that prosecution of the claim will "simultaneously tend to advance the interests of the absent class members." Fed. R. Civ. P. 23(a)(3); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006). The plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Deiter*, 436 F.3d at 466-67. In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and assesses the extent to which those facts would also prove the

claims of the absent class members. *Id.* These claims do not have to be factually or legal identical, but the class claims should be fairly encompassed by those of the named plaintiffs. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998).

Finally, the named plaintiff must "fairly and adequately protect the interests of class" without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179-80 (4th Cir. 2010). A conflict of interest will not defeat the adequacy requirement when "all class members share common objectives[,] the same factual and legal positions, and . . . the same interest in establishing the liability of defendants." *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 430). Moreover, the conflict must not be "merely speculative or hypothetical." *Id.*

If the named plaintiff satisfies each of these requirements under Rule 23(a), the Court must still find that the proposed class action fits into one of the categories of class action under Rule 23(b) in order to certify the class. Under Rule 23(b)(1), a class action may be maintained if the plaintiff shows that absent a class action, there is a risk of "inconsistent or varying adjudications" across individual class members that would result in "incompatible standards of conduct" for the defendant, or a risk of individual adjudications resulting in dispositive rulings that "substantially impair or impede" the ability of other plaintiffs to protect their interests. Fed. R. Civ. P. 23(b)(1). A class action is also maintainable if the defendant has "acted or refused to act on grounds that apply generally to the class," such that injunctive or declaratory relief applying to the whole class is appropriate. Fed. R. Civ. P. 23(b)(2). Finally, a class action may be maintained under Rule 23(b)(3) if common questions of law or fact "predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Although similar to Rule 23(a)'s commonality requirement, the test for predominance under Rule 23(b)(3) is "far more demanding" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). The predominance and superiority requirements under Rule 23(b)(3) are designed to ensure that the class action "achieve[s] economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gunnells*, 348 F.3d at 424 (quoting *Amchem*, 521 U.S. at 615). If the named plaintiff satisfies all of the Rule 23(a) requirements and one of the Rule 23(b) requirements, then class certification is appropriate.

Finally, the Court notes that a decision to certify a class is based on whether or not a putative class satisfies the Rule 23 factors, not on a preliminary assessment of the underlying merits of the claim. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

### B. Overtime Fringe Benefits Class

Defendants do not significantly contest the certification of the Overtime Fringe Benefits Class. Schuster devotes its entire Memorandum in Opposition to the Motion for Class Certification to opposing the Carpenter Class and does not challenge any aspect of the Overtime Fringe Benefits Class. Whiting-Turner nominally opposes class certification of the Overtime Fringe Benefits Class, but its arguments are entirely on the merits of Plaintiffs' claim and are thus not relevant to the analysis. *See id.*

The Overtime Fringe Benefits Class is clearly ascertainable, satisfies the Rule 23(a) factors, and meets the predominance and superiority requirements of Rule 23(b)(3). There is no dispute that Schuster can identify those workers who were not paid overtime fringe benefits without a significant administrative burden. On numerosity, there are at least 100 members, and possibly up to 1,600 members, making joinder of all members impractical. On commonality, Schuster admits that it did not pay any of its workers fringe benefits for overtime hours worked, and the legality of this policy is a question that not only is common to the class, but also predominates over any other factor or defense that each individual class member might have on this claim, such that a class action is a superior, more efficient means to resolve this dispute. As for typicality, the named Plaintiffs' claims that they were not paid fringe benefits for overtime hours worked, and their legal arguments regarding the applicability of the PLA's provisions to Schuster and Whiting-Turner's responsibility to enforce the agreement, are identical to the claims and arguments that would be offered by other proposed class members. Adequacy is satisfied because there is no apparent conflict of interest, and Plaintiffs' counsel is experienced in complex civil litigation. Accordingly, the Court will grant the Motion for Class Certification as to the Overtime Fringe Benefits Class.

## C.    Carpenter Class

As was the case for the Overtime Fringe Benefits class, there is no significant dispute that the Carpenter Class satisfies the requirements of ascertainability, numerosity, and adequacy. The class consists of every employee classified as a carpenter on the Project, estimated at 388 individuals, who can be identified from Schuster's payroll records without significant administrative burden. Likewise, there is no apparent conflict of interest between the named

Plaintiffs and their counsel and the rest of the class members. Therefore, the Court finds that these factors are satisfied.

Defendants, however, dispute that typicality and commonality have been established. Schuster argues that Plaintiffs cannot be considered "typical" of any putative class because they were paid at carpenter rates for almost all of the hours they worked, with Amaya receiving pay at the carpenter rate for 98 percent of his hours, Gonzalez receiving the carpenter rate for 94 percent of his hours, and Castillo receiving that rate 95 percent of the time. But the test for typicality is whether the facts relied upon by the plaintiffs to prove their claims "would also prove the claims of the absent class members," not whether they have suffered the same or greater damages than the average class member. *See Deiter*, 436 F.3d at 466-67 (noting that typicality is established if "as goes the claim of the named plaintiff, so go the claims of the class"). Here, Plaintiffs are advancing claims for the higher rate for those hours for which they were not paid as carpenters, and the core of these claims is Plaintiffs' position that it is impermissible to pay a carpenter at a rate below the carpenter rate, regardless of the work performed. Other than the number of hours worked at a lower rate, the facts and theories underlying Plaintiffs' claims will mirror those of other Carpenter Class members. The Court therefore finds that typicality has been satisfied for the Carpenter Class.

On commonality, Schuster argues that Plaintiffs have not made a showing that it engaged in a pattern or practice of failing to pay carpenters the prevailing carpenter wage rate for every hour worked. The three named Plaintiffs have offered affidavits attesting to this practice and stating that, under the threat of not getting paid at all, they were forced to sign records either certifying that some of their hours were laborer hours, or leaving the type of hours blank, only to have those records filled in to classify some work as payable at the laborer, rather than carpenter,

wage rate. They also offer records, such as those relating to Employees #005992 and #101012, which appear to show that certain carpenters were at one point paid at the laborer rate, then at the carpenter rate, then again at the laborer rate multiple months later. Although Schuster has offered explanations for the various "trouble tickets" and noted that pay adjustments in the employee's favor were sometimes made, those explanations effectively acknowledge that in several cases, including ticket numbers 000025, 000120, 000031, 000147, 000213, and 000032, Schuster applied the carpenter rate only to work qualifying as carpenter work, not to all work performed by qualified carpenters. *See* Schuster Opp'n MCC at 20-21, ECF No. 91. While it is unclear whether these trouble tickets related to provisional employees, permanent laborers, or permanent carpenters, they are consistent with Plaintiffs' assertion that Schuster had a policy of paying carpenters at the carpenter rate only for carpenter work.

Schuster argues that these factual allegations are insufficient to support a finding of commonality based on *Wal-Mart v. Dukes,* 564 U.S. 338 (2011), and related cases. In *Wal-Mart,* the United States Supreme Court held that the plaintiffs had failed to demonstrate commonality because 120 affidavits submitted by Wal-Mart employees describing sex discrimination at various stores nationwide did not constitute "significant proof that an employer operated under a general policy of discrimination." *Id.* at 353. Here, Plaintiffs' offering of three affidavits from Plaintiffs and a limited number of examples arising from payment records, out of 388 putative class members, is less than ideal to establish a pattern or practice of unlawful conduct. *See Brown v. Nucor Corp.,* 785 F.3d 895, 912-13 (4th Cir. 2015) (finding that affidavits alleging discrimination from approximately one out of every 6.25 class members was "substantially more probative than that in *Wal-Mart*" of a pattern and practice of companywide discrimination). The *Wal-Mart* plaintiffs, however, were seeking certification of a nationwide class, across 3,400

stores, asserting claims of employment discrimination by employees in different jobs at different levels of the organization, where the corporate policy was to allow "discretion by local supervisors over employment matters." *Wal-Mart*, 564 U.S. at 355-56. Here, Plaintiffs seek a much narrower finding. They seek to establish commonality for claims of a single class of employees—carpenters—working within a single construction project with common management, based on an alleged pattern and practice of failing to pay the prevailing carpenter wage. *Wal-Mart* is therefore not dispositive.

Although Plaintiffs' pattern or practice allegations could have been more robust, Plaintiffs have nevertheless established commonality based on their allegation that Schuster violated the PLA by regularly failing to pay carpenters at the carpenter rate for certain work while they were in a "provisional" status at the outset of their employment. Schuster acknowledges that it had such a policy and applied it uniformly to employees who worked on the Project. If Schuster's policy of temporarily placing an employee in a provisional status is found to be invalid, then Schuster would likely be liable for unpaid wages for every carpenter paid at the laborer rate during the provisional period. The claim that the provisional status policy was invalid is thus a "common contention" establishing commonality for the Carpenter Class because "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Likewise, whether that acknowledged policy extended beyond the provisional period, as suggested by Plaintiffs' affidavits and payroll record evidence, presents a common question central to the class claims and subject to common resolution. The question of whether such a policy was valid would predominate over individual fact issues because its answer would necessarily resolve whether carpenters would be entitled to damages for every hour paid as a laborer. Therefore, the Court

finds that the Carpenter Class has satisfied both the commonality requirement of Rule 23(a) and the more stringent predominance requirement under Rule 23(b)(3).

Although a finding that the provisional policy was valid may jeopardize class certification because it could require an individualized assessment of each carpenter's claim of improper payments at the laborer rate, that possibility is not a valid basis for failing to certify the Carpenter Class at this point. In *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indust. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010) (*"United Steel"*), oil refinery workers brought suit against their employer, ConocoPhillips, alleging that they were forced to remain "on duty" during their lunch break, in violation of California law. *Id.* at 804. Plaintiffs argued that ConocoPhillips had a uniform policy of requiring operators to respond to their radios and alarms during the lunch breach that provided the basis for class certification. *Id.* at 804 & n.3. The district court rejected this theory, concluding that "there could be no assurances that plaintiffs would prevail on their 'on duty' theory," such that "the inquiry would then shift to whether plaintiffs *actually* missed meal breaks, and the Court would be faced with a case requiring individualized trials on each class member's meal period claims." *Id.* at 808. The United States Court of Appeals for the Ninth Circuit reversed this decision, finding that the district court "abused its discretion by declining certification based on the *possibility* that the plaintiffs would not prevail on the merits of their 'on duty' theory." *Id.* The Ninth Circuit noted that the district court had discretion to modify a class certification order based on subsequent developments in the case, including decertifying the class if the "on duty" theory was eventually rejected. *Id.* at 809-810 (citing *Gen. Tel. Co. of the Sw. v. Falson*, 457 U.S. 147, 160 (1982)).

The logic of *United Steel* is equally applicable here. Schuster's policy of hiring workers in a "provisional" status for a period of time presents a uniform policy that, if found to be invalid, would provide common grounds for relief across the whole class. Accordingly, the Court finds that the Carpenter Class satisfies the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, that common issues "predominate over any questions affecting only individual members, and that a class action is superior to all other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Motion for Class Certification is granted as to the Carpenter Class.

## II.    Motion for Leave to Amend the Complaint

Plaintiffs have also filed a Motion for Leave to Amend the Complaint. Through the Motion, Plaintiffs seek to add (1) factual support for the argument that all workers on the Project were intended third-party beneficiaries of the PLA; (2) allegations that Whiting-Turner was contractually obligated to enforce the PLA against non-signatories to the PLA; (3) allegations that Schuster assented to the terms of the PLA through its conduct; and (4) allegations that Schuster failed to comply with the wage and fringe benefits requirements of the Project Manual. These proposed amendments come after the October 16, 2017 deadline for amending the pleadings established in the Court's Amended Scheduling Order.

### A.    Legal Standard

When a Motion to Amend has been filed after a deadline for amendment in a scheduling order, a plaintiff must satisfy a two-part test. First, the plaintiff must show "good cause" for the delay in order to justify a modification of the deadline in the scheduling order pursuant to Federal Rule of Civil Procedure 16(b)(4). *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). If the plaintiff satisfies the requirements of Rule 16, the Court must then

16

consider the amendment under the standards of Rule 15. *See Elat v. Negoubene*, 993 F. Supp. 2d 497, 519 (D. Md. 2014).

In order to show "good cause" for a modification of a scheduling order under Rule 16(b)(4), "the party seeking relief [must] show that the deadlines cannot reasonably be met despite the party's diligence." *Cook v. Howard*, 484 F. App'x 805, 815 (4th Cir. 2012); *see, e.g., Squyres v. Heico Cos., LLC*, 782 F.3d 224, 237 (5th Cir. 2015). This inquiry largely revolves around whether the plaintiff has diligently attempted to comply with the deadline set forth in the scheduling order. *See, e.g., Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 610 (8th Cir. 2011) ("The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements.")

Rule 15(a) requires that leave to file an amended complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "A motion to amend should be denied 'only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)). To determine whether a proposed amended complaint would be futile, the Court reviews the revised complaint under the standard used to evaluate a motion to dismiss for failure to state a claim. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).

**B.    Rule 16**

Plaintiffs filed a Notice of Intent to File a Motion for Leave to Amend Complaint on April 5, 2018, nearly six months after the October 16, 2017 deadline for amending the complaint set forth in the Court's Amended Scheduling Order. While this delay is significant, it is not automatically indicative of a lack of diligence. Here, Plaintiffs' proposed amendments largely

consist of the addition of facts from the affidavit of Brent Booker, one of the individuals who negotiated the PLA on behalf of various trade unions. Plaintiffs were first notified that Booker might "have knowledge about the negotiation, drafting, and execution of the Project Labor Agreement" in a September 29, 2017 response to an interrogatory. Resp. Interrog No. 3, MAC Ex. 14, ECF No. 151. Booker was listed as one of seven individuals who may have had knowledge of the PLA, but no contact information was provided. Plaintiffs first received specific facts known to Booker on November 6, 2017, after the amendment deadline had passed, when they received the transcript of an arbitration hearing at which Booker testified.

From that point, it reasonably took Plaintiffs some time to locate Booker, obtain an affidavit from him, and incorporate certain facts from that affidavit into an amended complaint. Although several months passed until Plaintiffs secured an affidavit from Booker on February 13, 2018, they were simultaneously processing voluminous amounts of discovery. According to Plaintiffs, they received over 15,000 pages of documents on September 29, 2017, just before the amendment deadline, and an additional 60,000 pages after the deadline for amendment had passed. Courts have found good cause under Rule 16 when the factual basis for an amendment was identified in discovery, particularly if discovery is extensive. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 707 (D. Md. 2011) (finding that the defendant had acted with appropriate diligence when the amendment was based off of 902 pages of discovery); *Weisheit v. Rosenberg & Associates, LLC*, No. JKB-17-0823, 2018 WL 1942196, at *3-4 (D. Md. Apr. 25, 2018) (finding that, even though the plaintiff "had some sense before the [amendment deadline] of the constellation of facts that undergird" a proposed crossclaim and it was technically possible to file the amendment prior to the deadline, good cause was shown based on the need for considerable consultation with experienced counsel before filing the

amendment). At the same time, Plaintiffs were required to prepare a Motion for Class Certification by December 1, 2017, which included a Joint Record of over 1,300 pages, and file a reply brief by February 28, 2017. Notably, Plaintiffs explanation for the delay is more robust than those rejected as insufficient to meet the good cause standard. *See Nourison*, 535 F.3d at 298 (finding that the moving party failed to show good cause under Rule 16 when the only articulated reason for the delay in seeking to amend an Answer was that counsel had noticed an additional potential defense during the course of responding to a motion for summary judgment). Under these circumstances, Plaintiffs have demonstrated diligent efforts to comply with the Court's order. Accordingly, the Court finds that Plaintiffs have shown good cause under Rule 16.

## C. **Rule 15**

Having found that Plaintiffs have satisfied the requirements of Rule 16, the Court also finds that leave to amend the complaint should be granted under the more liberal standard of Rule 15, which permits amendment in the absence of bad faith, prejudice, or futility. Fed. R. Civ. P. 15; *Nourison*, 535 F.3d at 299. Based on the finding that Plaintiffs acted with diligence, there is no evidence that they have acted in bad faith in seeking to amend at this time. As for prejudice, Plaintiff's proposed amendments, while adding new legal arguments and factual support for their claims, do not add qualitatively new claims or alter the scope of discovery. For example, Plaintiffs have already argued, in their Memorandum in Opposition to the Motion to Dismiss, that they are third-party beneficiaries of the PLA. They have likewise argued in their Motion for Class Certification that the Project Manual bound Schuster to pay the prevailing wage rates. Notably, neither Defendant has articulated any basis for prejudice as a result of the proposed amendments. Defendants have not yet moved for summary judgment. Courts have

allowed amendments under these circumstances, even immediately before trial. *See, e.g., Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.V.,* 985 F.2d 164, 168 (4th Cir. 1993) (affirming the district court's granting of leave to amend the complaint on the eve of trial when the amendment "did not change the substance of the case, did not require additional discovery, and did not prejudice" the defendant, even though plaintiff could "have asserted its claim earlier"). Accordingly, the Court finds that the proposed amendments present no prejudice to the Defendants.

Finally, the proposed amendments are not futile. They do not add new causes of action that could be subject to a motion to dismiss. Rather, they simply add more facts to support certain claims and reframe others in a manner consistent with the legal arguments advanced by Plaintiffs throughout this litigation. Moreover, there is some factual and legal basis underlying these new allegations. Plaintiffs' proposed amendments asserting that all workers are intended third-party beneficiaries of the PLA and that Schuster assented to the provisions of paragraph 12.5 of the PLA by performing work on the Project, are supported by the affidavit of Booker, one of the lead union negotiators on the PLA, who stated that the intent of paragraph 12.5 of the PLA "was that all employees of any contractor or subcontractor who worked on the project would be paid according to Maryland state prevailing wage law." J.R. 1334. The proposed amendment alleging that Schuster violated the Project Manual by failing to pay overtime fringe benefits is based on the text of the Project Manual itself. Finally, Plaintiffs' contention that Whiting-Turner was bound to require Schuster to comply with the terms of the PLA is supported by *Baltimore/Washington Construction and Public Employee Laborer's District Council,* 244 F. Supp. 3d 490 (D. Md. 2017), in which the court held that Whiting-Turner was required to submit a dispute arising out of paragraph 12.5 of the PLA to arbitration, because it was at least

ambiguous whether Whiting-Turner was required to enforce compliance with the PLA by Schuster. *Id.* at 496-97. Accordingly, the Court finds that Plaintiffs have satisfied the requirements of Rule 15. The Motion for Leave to Amend the Complaint shall be granted.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification and Motion for Leave to Amend the Complaint are GRANTED. A separate Order shall issue.

Date: July 10, 2018

THEODORE D. CHUANG
United States District Judge