# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARIO ERNESTO AMAYA,
JOSE NORLAND GONZALEZ and
JOSE AMADEO CASTILLO,

      Plaintiffs,

      v.

DGS CONSTRUCTION, LLC and
THE WHITING-TURNER CONTRACTING
COMPANY,

      Defendants.

Civil Action No. TDC-16-3350

## MEMORANDUM OPINION

Plaintiffs Mario Ernesto Amaya, Jose Norlan Gonzalez, and Jose Amadeo Castillo, carpenters formerly employed by Defendant DGS Construction, LLC, d/b/a Schuster Concrete Construction ("Schuster") on the construction of the MGM Resort Casino at National Harbor in Prince George's County, Maryland, have brought suit against Schuster and Defendant The Whiting-Turner Contracting Company ("Whiting-Turner") for violations of the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. §§ 3–401 to 3–431 (West 2016), and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab & Empl. §§ 3–501 to 3–509, as well as for state law claims of breach of contract and unjust enrichment. Plaintiffs also seek a declaratory judgment that they are third-party beneficiaries of a Project Labor Agreement ("PLA") signed by Whiting-Turner and various trade unions. Plaintiffs allege that Schuster failed to pay Plaintiffs at the rate for carpenters for every hour worked and failed to pay certain fringe benefits for overtime work as required by the PLA. Pending before the Court are

Plaintiffs' Motion for Partial Summary Judgment and separate Motions for Summary Judgment filed by Whiting-Turner and Schuster. For the reasons that follow, Plaintiffs' Motion is DENIED, Whiting-Turner's Motion is GRANTED, and Schuster's Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Relevant factual and procedural background is set forth in the Court's July 10, 2018 Memorandum Opinion granting Plaintiffs' Motion for Class Certification and certifying two classes, the Carpenter Class and the Overtime Fringe Benefit Class. *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 444–46 (D. Md. 2018). Additional information relevant to these Motions is set forth below.

Whiting-Turner served as the Project Contractor for the construction of the MGM Resort Casino at National Harbor ("the Project"), which was developed by MGM National Harbor, LLC ("MGM"). On September 15, 2014, Whiting-Turner and 16 trade unions ("Unions") entered into the PLA, which governed various aspects of the construction of the Project. Brent Booker, Secretary-Treasurer of the North America's Building Trades Union, representing the Unions, and Hunter Clayton of MGM negotiated the terms of the PLA. The PLA defines the Signatories of the PLA as "all construction contractors and subcontractors of whatever tier engaged in onsite construction work within the scope of this Agreement that sign this Agreement or a letter of assent thereto." Joint Record ("J.R.") 0001, ECF No. 208. The PLA further states that Whiting-Turner "shall require all contractors and subcontractors who have been awarded contracts for work covered by this Agreement to accept and be bound by the terms and conditions" of the PLA "by executing the Letter of Assent . . . prior to commencing work." J.R. 0003. In paragraph 12.5, the PLA also provides that:

In the event that the Project Contractor or a Signatory does not receive at least three bids on any trade package from contractors or subcontractors that are qualified to perform the work identified in the trade package and have the business resources necessary to perform the work and which may also have been prequalified prior to bidding ("Qualified Contractor") and are signatories to a collective bargaining agreement with a Union with jurisdiction over the work to be performed, then that trade package shall be exempt from the requirements of this Agreement; provided, however that the Agreement shall apply if the lowest bidder on the trade package is a Qualified Contractor and is a signatory to such a collective bargaining agreement.

J.R. 0016. The same provision, however, clarified that:

Exemption from this Agreement shall not automatically relieve the successful bidder from complying with Project based requirements, such as, but not limited to, safety and quality programs. For all contractors working on the project, payment of prevailing wages and fringe benefit rates of the project as indicated on the Maryland Department of Labor, Licensing, and Regulation Informational Wage Rate for Prince George's County determined at the commencement of the Project, which Developer has voluntarily adopted for the Project, shall be a minimum requirement and contractors are free to provide wages and fringe benefits at rates in excess of such prevailing rates.

*Id.*

On December 4, 2014, Schuster entered into an express contract with Whiting-Turner to perform concrete work on the Project. Schuster is a contractor that does not have a collective bargaining agreement with a Union. Schuster was one of only two companies to bid on a particular trade package for concrete work on the project. Since only two bids were received and only one was from a contractor with a signed collective bargaining agreement, the trade package was exempt from the requirements of the PLA, and Schuster did not sign a Letter of Assent or similar document expressly agreeing to the terms of the PLA. Schuster therefore was not a Signatory to the PLA. However, as a subcontractor on the Project, Schuster was required by the PLA to pay prevailing wages and fringe benefit rates as stated in the Maryland Department of Labor, Licensing, and Regulation ("DLLR") Informational Wage Rate for Prince George's County. Schuster was also subject to the Whiting-Turner Project Manual, which established basic hourly

rates and fringe benefit payments for various classifications of workers. According to the Project Manual, these rates "were derived from" the DLLR Informational Wage Rates for Prince George's County. J.R. 0146. Plaintiffs were each employed by Schuster during several months in 2015.

When Schuster hired workers for the Project, its representatives met with prospective workers and completed a "Referral Sheet" for each applicant. J.R. 00375. Schuster considered the Referral Sheet to be an "employment offer" that, along with other documents, formed an employment agreement with a particular employee. *Id.* According to Lorraine Burns, Schuster's Chief Financial Officer ("CFO"), a representative from Human Resources would review the Referral Sheet, which listed the applicant's starting job title and hourly rate for Schuster jobs, with the applicant. If the applicant did not approve of the rate of pay listed on the Referral Sheet, there was no hire. Although Schuster has Referral Sheets for Amaya, Gonzalez, and Castillo that list the employee's name, the date of application and hire, the Schuster foreman who referred the employee, the salary as approved by that foreman, the work assignment at the Project, and the date of the employee's first day on the Project, neither a Schuster employee nor the Plaintiff signed the document.

The Referral Sheets reference a pay rate of $17 per hour for Amaya and Gonzalez and $20 per hour for Castillo for work performed for Schuster outside of the Project. According to Burns, "whenever the Plaintiffs worked at the Project, Schuster paid the Plaintiffs in accordance with the minimum wage rates in Section S.3 of the Project Manual," which were higher than these figures. J.R. 00376.

In their depositions, Amaya, Gonzalez, and Castillo explained how they were hired to work on the Project. Amaya stated that he applied for the job on the Project because he had heard from Gonzalez, who is his nephew, and other workers that Schuster was paying carpenters a wage of

4

$35 per hour. He denied that he was told that his rate on Schuster projects other than the Project would be $17 per hour or that the Referral Sheet was used in discussions regarding his pay rate. He acknowledged, however, that he was given the Referral Sheet so that he would know where and when to report for training and for work. Amaya did not remember what other employment documents he filled out and stated that Schuster's human resources representative filled out those documents for him.

Gonzalez stated that he was told by a colleague at another construction company that he would be paid at "scale" if he worked for Schuster on the Project. J.R. 01688. He then went to Schuster's office and filled out an application to work on the Project, with the assistance of a human resources representative. The representative told him that his regular salary would be $17 per hour — the amount listed on the Referral Sheet — but when he stated that he had been making $27 per hour at another company, she told him that his salary on the Project would be higher and that it would be arranged later with his foreman.

Castillo learned of the Project from one of Schuster's foremen, Sergio Martinez, who told Castillo that Schuster paid $26 per hour and offered a retirement plan. Castillo also filled out an application at Schuster's office with the help of a secretary and was told where to report the next day. Castillo was angry when his first paycheck was at a rate of $20 per hour, not $26.

In Count I of the Amended Complaint, Plaintiffs seek a declaratory judgment against Defendants that they are third-party beneficiaries of the PLA. In Count II, Plaintiffs assert a breach of contract claim against Defendants, alleging that Schuster breached the PLA by failing to pay Plaintiffs in accordance with the PLA and that Whiting-Turner breached that agreement by not assuring Schuster's compliance with the PLA. In Count III, Plaintiffs assert that Schuster violated the MWHL by failing to pay Plaintiffs legally mandated overtime pay. In Count IV, they assert a

violation of the MWPCL based on Schuster's failure to pay Plaintiffs' wages in accordance with the rates required by the PLA and the Project Manual, including overtime and fringe benefits. Finally, in Count V, Plaintiffs allege a claim of unjust enrichment against Schuster because Schuster inequitably retained a benefit from Plaintiffs' labor by not compensating them under the terms of the PLA. On July 10, 2018, the Court certified two classes of Plaintiffs, the Carpenter Class and the Overtime Fringe Benefit Class. *Amaya*, 326 F.R.D. at 448, 450.

## DISCUSSION

Plaintiffs seek summary judgment on behalf of the Carpenter Class and the Overtime Fringe Benefit Class on both Counts I and II, arguing that the Unions' intent that non-union workers benefit from the PLA gives them status as third-party beneficiaries to the PLA and that Schuster's time-splitting scheme and failure to pay fringe benefits on overtime hours and Whiting-Turner's failure to correct Schuster's conduct breached the terms of the PLA as to both classes of Plaintiffs. Plaintiffs also seek summary judgment on behalf of both classes on Counts III and IV, on the grounds that Schuster's breach of the PLA constitutes a violation of the Maryland wage statutes.

Whiting-Turner seeks summary judgment on the claims pleaded against it in Counts I and II, arguing that the terms of the PLA as a whole do not establish that Plaintiffs have a right to enforce the PLA and that it did not breach any contractual obligations. Schuster also seeks summary judgment on all counts, adopting Whiting-Turners arguments as to Count I, arguing that Plaintiffs' state law claims are preempted, defending its compensation of Plaintiffs under the applicable contracts and wage laws, and asserting that Plaintiffs cannot bring an action for unjust enrichment since an employment contract governed their compensation.

## I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II. Third-Party Beneficiary

Under Maryland law, individuals who are not parties to a contract may nevertheless have standing to enforce the contract if they meet the requirements for third-party beneficiaries. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC* ("*Towers II*"), 56 A.3d 170, 212 (Md. 2012). Maryland follows the Restatement (Second) of Contracts, which provides that:

> (1) unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Id.* (quoting Restatement (Second) of Contracts § 302 (Am. Law Inst. 1981)). In assessing whether an individual is a third-party beneficiary, a court should "look to 'the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention.'" *Id.* at 213 (quoting *Ferguson v. Cramer*, 709 A.2d 1279, 1283 (Md. 1998)); *see Volcjak v. Wash. Cty. Hosp. Ass'n*, 723 A.2d 463, 477–78 (Md. Ct. Spec. App. 1999).

When evaluating the contract, intent must be "garnered from the terms considered as a whole, and not from the clauses considered separately." *Laurel Race Course v. Regal Constr.*, 333 A.2d 319, 327 (Md. 1975). One "crucial fact" to consider is "whether the pertinent provisions in the contract were 'inserted to benefit' the third party." *Towers II*, 56 A.3d at 212 (alteration omitted) (quoting *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009)). While not dispositive, "whether the third party is named in the contract or its 'antecedent agreements'" is another key factor. *Id.* at 212 (quoting *Lovell Land*, 969 A.2d at 297–98); *see Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009). Whether the contract expressly gives enforcement power to the putative third-party beneficiary also bears on the analysis. *Long Green Valley Ass'n v. Bellevale Farms Inc.*, 46 A.3d 473, 485–86 (Md. Ct. Spec. App. 2012), *aff'd*, 68 A.3d 843 (Md. 2013). The provisions purporting to create the third-party interest should be "central" to the contract as a whole, rather than merely "peripheral." *Towers II*, 56 A.3d at 213. In assessing the parties' intent, consideration of extrinsic evidence is permitted. *Id.* at 213 n.61.

"Maryland law is quite restrictive on the issue of whether one may be considered a third-party beneficiary." *CX Reinsurance Co., Ltd. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016),

*aff'd*, 691 F. App'x 130 (4th Cir. 2017). In particular, Maryland courts focus on whether the third party is the "primary party in interest." *Towers II*, 56 A.3d at 213. "It is not enough that the contract may operate to [the plaintiff's] benefit. It must clearly appear that the parties intend to recognize [the plaintiff] as the primary party in interest and as privy to the promise." *Mackubin v. Curtiss-Wright Corp.*, 57 A.2d 318, 321 (Md. 1948); *Volcjak*, 723 A.2d at 478 (quoting *Weems v. Nanticoke Homes, Inc.*, 378 A.2d 190, 195 (Md. Ct. Spec. App. 1977)). In *Towers II*, the Court of Appeals of Maryland emphasized that in two prior cases, *Prescott v. Coppage*, 296 A.2d 150 (Md. 1972), and *Shillman v. Hobstetter*, 241 A.2d 570 (Md. 1968), in which third-party beneficiary status was established, those parties were "the primary parties in interest under those contracts because the provisions that named them were obviously inserted to benefit them." *Towers II*, 56 A.3d at 213 (alterations omitted); *Prescott*, 296 A.2d at 156 (holding that where a court order had named a receiver to take possession of and manage the assets of a loan company and appointed an attorney to assist the receiver, the creditors of the loan company were third-party beneficiaries because the order "recognize[d]" the creditors as a "class as a primary party in interest"); *Shillman*, 241 A.2d at 572–73, 576–77 (holding that purchasers of homes were the intended beneficiaries of an agreement between a residential developer and the Federal Housing Administration that required the developer to commit to return deposits to the purchasers if the construction was not completed, because where the only thing the developer agreed to do was to provide refunds to the purchasers, those purchasers were meant to receive "the primary and direct benefit," as shown on the "face of the contract"). In *Towers II*, by contrast, the court found that where the owners of two adjoining properties executed separate leases with two different but related developers to build two high-rise apartment towers, each developer was not a third-party beneficiary to the lease to which it was not a party. *Towers II*, 56 A.3d at 177, 213. The Court of Appeals of Maryland held

9

that although each tenant developer benefited from the lease with the other because the leases referenced the other tenant in provisions that related to easements connecting the two towers, plans for common areas available to both towers, and overall site plans referencing both properties, each developer was not a third-party beneficiary to the contract with the other, because the leases "were clearly entered into first and foremost for the benefit of the parties that signed them." *Id.* at 213.

Likewise, in *Volcjak*, a contract between a hospital and a company, Blue Ridge, that provided exclusive anesthesiology services for the hospital stated that Blue Ridge "agrees to evaluate those providers rendering Anesthesia Services at the Hospital and to consider them for long term employment or contract" based on certain specified criteria. *Volcjak*, 723 A.2d at 468. Although the contract explicitly referenced the pre-contract anesthesiologists and required Blue Ridge to consider them for positions, the court held that those physicians were not third-party beneficiaries of the contract because the language of the contract revealed that the purpose of the clause was to provide the hospital with "litigation protection" by reducing the likelihood of complaints by the current anesthesiologists, not to confer upon those physicians a benefit of increased likelihood of hiring by Blue Ridge. *Id.* at 478. Thus, although the contract provided a benefit to the plaintiff anesthesiologist, he was an incidental beneficiary. *See id.*

Here, the PLA as a whole does not evince an intent on the part of MGM, Whiting-Turner, and the Unions to provide Plaintiffs the ability to enforce the PLA. *See Laurel Race Course*, 333 A.2d at 327. Rather, the PLA establishes that the Signatories, the Unions, and Union workers are primarily meant to benefit from paragraph 12.5, while non-union workers like Plaintiffs benefit only secondarily. The PLA states that the contracting parties "desire to mutually establish wages, hours and working conditions *for the craft workers of Signatories*, and to encourage close cooperation between the Signatories and the Unions so that a satisfactory, continuous and

10

harmonious relationship will exist between and among the Parties throughout the pendency of the Project." J.R. 0002 (emphasis added). The PLA further expresses the parties' wish to "maintain a spirit of collaboration, mutual benefit, harmony, labor-management peace, and stability" and to efficiently resolve disputes. J.R. 0002. That the PLA overall, including paragraph 12.5, is intended for the benefit of these entities is clear from the fact that the Signatories, Unions, and union workers are repeatedly referenced throughout the PLA. *See, e.g.*, J.R. 0002 (referencing "craft workers of Signatories," "Signatories," and "Unions" in a statement of purpose); J.R. 0009 (referencing the "Signatories, Unions, and their respective employees" in discussing dispute resolution procedures); J.R. 0011 (requiring the prevailing wage for "[a]ll craft employees employed by a Signatory"); J.R. 0011–12 (outlining rules on hours of work, overtime, reporting pay, and holidays for "craft workers of Signatories"); J.R. 0013 (stating that the terms of the PLA will govern the project and work schedules of "employees of Signatories and those employees of Project Contractor not excluded from this Agreement"); J.R. 0014 (providing that local union collective bargaining agreements will set individual conditions of work for Signatory employees so long as those terms are consistent with the PLA and providing hiring guidelines for Signatory employees). By contrast, non-union workers of non-Signatory contractors are not a group specifically "named in the contract." *Towers II*, 56 A.3d at 212. Thus, the PLA overall is primarily designed to benefit MGM, Whiting-Turner, the Signatories, the Unions, and union workers, not non-union workers such as Plaintiffs. *See id.* at 213.

Paragraph 12.5 must be read in this context. That provision states that under certain limited circumstances when there are insufficient bids on a trade package, a non-Signatory contractor could obtain work on the Project subject to the limitation that "[f]or all contractors working on the Project, payment of the prevailing wages and fringe benefit rates as indicated on the [Maryland

11

DLLR] Informational Wage Rate for Prince George's County . . . shall be a minimum requirement." J.R. 0016. When considered in the context of the entire PLA, which is designed to benefit the Signatories, Unions, and Union workers, paragraph 12.5 is most fairly construed to primarily benefit these same entities by ensuring that non-Signatory, non-union contractors cannot unfairly undercut Union contractors, which would cause the number of trade packages subject to this limited exception to increase. Indeed, the fact that this provision only indirectly refers to non-union workers, who would necessarily be included in the reference to "all contractors working on the Project," but does not explicitly define a group of non-union workers protected by this provision, weighs against the conclusion that they are the primary party in interest for this provision. *Id.*

This purpose is confirmed by the Unions' acknowledgment that in negotiating paragraph 12.5, the Unions aimed to "level the playing field," such that the Union employers would not be disadvantaged by non-union contractors' ability to pay their employees below the prevailing wage rates and undercut the Unions. J.R. 0051. According to Booker, the Unions wanted to ensure that their "signatory contractors [would have] a reasonable opportunity to bid work." J.R. 00791. According to Ronald Eisenberg, Whiting-Turner's Senior Vice President and corporate representative, Whiting-Turner also understood that this was the Unions' and MGM's goal in negotiating this provision.

The PLA's grievance procedure provides further support for the position that paragraph 12.5 is primarily intended to benefit the parties to the contract and Union employees. The PLA provides procedures for Whiting-Turner, Signatories, Unions, and employees "subject to the provisions" of the PLA to resolve grievances arising out of the Project, which would necessarily include any enforcement of a potential breach of the PLA for Schuster's failure to pay its workers

12

in accordance with the PLA. J.R. 0009–10. The PLA makes clear that an "employee subject to the provisions" of the PLA must be a Union employee, since it directs that employee to work with a Union representative in pursuing the grievance. J.R. 0009–10. Indeed, this Court previously held in denying Defendants' Motions to Dismiss that the PLA dispute and grievance procedure did not apply to non-union employees on the Project or to trade packages exempt from the PLA under paragraph 12.5. The PLA thus contemplates that any breach of its provisions would be enforced by the parties to the contract or Union workers, not by non-union workers or by contractors who are exempt from the provisions of the PLA. These procedures weigh against the conclusion that the parties intended for non-union workers to be the primary beneficiaries of paragraph 12.5 or any other provision of the PLA and to have the right to enforce such a provision. *See Long Green Valley*, 46 A.3d at 485–86. Notably, the Unions invoked these grievance procedures on their own behalf against Whiting-Turner by seeking to compel Whiting-Turner to submit to arbitration regarding the same alleged breach of the PLA of which Plaintiffs accuse Whiting-Turner and Schuster here. *See Balt./Wash. Constr. & Pub. Emp. Laborer's Dist. Council v. Whiting-Turner Contracting Co.*, 244 F. Supp. 3d 490, 493–94 (D. Md. 2017).

Thus, the contract itself, along with the Union's own statements, establish that paragraph 12.5 was not "inserted to benefit" primarily non-union workers such as Plaintiffs. *Towers II*, 56 A.3d at 212 (alteration omitted). It instead reveals that the provision was primarily meant to benefit Signatory Union contractors, who while paying union wages under the terms of the PLA would not be underbid by non-union contractors paying their employees less, and the Unions and their members, who would receive work at the prevailing wage with those signatory Union contractors who successfully bid on Project work. As discussed above, although non-union workers for non-Signatories may receive a benefit under the PLA, in the form of a prevailing wage rate, that

secondary benefit is not sufficient under Maryland law to grant them third-party beneficiary status. Where Maryland law provides that third-party beneficiary status is conferred only when the beneficiary is the "primary party in interest" for the contract or the provision, Plaintiffs fall short of that requirement. *Id.* at 213. Their status is comparable to that of the incumbent anesthesiologists in *Volcjak* who were explicitly referenced in the contract between the hospital and Blue Ridge and clearly benefited from the provision requiring that they receive consideration for long term employment, but were deemed to have no right to enforce that provision because the primary party in interest for that provision was the hospital, which needed the provision to reduce the risk of litigation. *See Volcjak*, 723 A.2d at 478. Accordingly, Plaintiffs are "incidental beneficiar[ies]" not entitled to enforce the terms of the contract. *Towers II*, 56 A.3d at 212; *Volcjak*, 723 A.2d at 478.

Nevertheless, Plaintiffs argue that they are third-party beneficiaries because there is evidence in the record that the Unions, who are the promisees in that they were the recipient of the promise that all Project workers would receive the prevailing wage, intended to confer a benefit on them. In an affidavit, Brent Booker, who negotiated the PLA on behalf of the Unions, has attested to the Unions' intent in negotiating paragraph 12.5 of the PLA. The Unions not only wanted "to keep a level playing field for all bidders on the various projects" by requiring the minimum wage and fringe benefit amounts for all workers, but they also sought to ensure that "employees, no matter who they worked for, would benefit from the Agreement by being paid according to Maryland state prevailing wage law" such that they had "a contractual right to be paid at those wages rates and fringe benefits even if they worked for a nonunion contractor, like Schuster." J.R. 0051–52. Where Defendants have identified no contrary evidence of the Unions' intent, the Court concludes that the Unions, the promisees under the PLA, intended in part for non-

union workers such as Plaintiffs to benefit from the prevailing wage language in paragraph 12.5 of the PLA.

This additional motivation by the Unions does not alter the Court's conclusion. First, from Booker's statement and the context of the PLA, it is clear that assisting non-union workers was not the Unions' primary motivation, such that non-union workers were not "a primary party in interest" for purposes of the provision. *Towers II*, 56 A.3d at 213 (quoting *Ferguson*, 708 A.2d at 1283).

Moreover, the Court disagrees with Plaintiffs' assertion that the entire analysis "turns on the intent of the promisee under the contract" and that the promisor's intent is "irrelevant." Pls.' Cross-Mot. Summ. J. 24, ECF No. 193. For this proposition, Plaintiffs rely on cases such as *Weems v. Nanticoke Homes, Inc.*, 378 A.2d 190 (Md. Ct. Spec. App. 1977), and *Shillman v. Hobstetter*, 241 A.2d 570 (Md. 1968). In *Shillman*, the Maryland Court of Appeals applied the third-party beneficiary provision of the First Restatement of Contracts, which contains markedly different language that the presently applicable Second Restatement of Contracts. *Shillman*, 241 A.3d at 576. The First Restatement does not reference the intent of the parties, but instead states:

> Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3): (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary . . . .

*Id.* (quoting Restatement (First) of Contracts § 133 (1932)). Where the First Restatement required a showing from the contract and surrounding circumstances only "that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary," the court understandably focused only on the intent of the promisee. *Id.* (quoting

Restatement (First) of Contracts § 133). *Weems* merely summarized the holding of *Shillman*, stating that "the court emphasized that the rights of a third party are dependent upon the intentions of the *promisee*, since the promisor's reason for making the promise is generally his desire to obtain certain consideration." *Weems*, 378 A.2d at 196.

However, "Maryland now follows the rule set out in Restatement (Second) of Contracts § 302 (1981)." *CR-RSC Tower I, LLC v. RSC Tower 1, LLC* ("*Towers I*"), 32 A.3d 456, 483 (Md. Ct. Spec. App. 2011). The language of the Second Restatement makes clear that while the promisee must have intended to confer a benefit on the third party, third-party beneficiary status must also be "appropriate to effectuate the intention of the *parties*." *Towers II*, 56 A.3d at 212 (quoting Restatement (Second) of Contracts § 302) (emphasis added); *see also Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832–33 (Minn. 2012) (noting that under Minnesota law, which follows the Second Restatement, "a third party is an intended beneficiary under a contract when it is appropriate to recognize third-party beneficiary rights to effectuate the intent of the parties to the contract, *and* either the duty owed or the intent-to-benefit test is satisfied" (emphasis added)).

When the putative third-party beneficiaries in *Towers II* argued to the Maryland Court of Appeals, citing *Shillman*, that they should prevail since "the promisee's intent controls," the court instead considered "the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention" and thus focused on the terms of the agreements at issue to assess whether the text manifested an intent to benefit the third parties. *Towers II*, 56 A.3d at 211 & n.59, 213–14 (quoting *Ferguson*, 709 A.2d at 1283). Thus, to claim third-party beneficiary status, Plaintiffs must show not only that the promisee, the Unions who

16

negotiated the PLA, intended to provide them with the primary benefit of the contract, but also that conferring that status upon them effects the intent of all of the parties to the PLA, including Whiting-Turner and MGM. As discussed above, the contract and the parties' statements collectively reveal that their common intent was not to confer such status on non-union workers such as Plaintiffs.

For similar reasons, Plaintiffs' reliance on *Avco Delta Corp. v. United States*, 484 F.2d 692 (7th Cir. 1973), and *Beverly v. Macy*, 702 F.2d 931 (11th Cir. 1983), for the proposition that Plaintiffs need not be the sole beneficiary of the contract, is misplaced. *Avco* addressed whether workers on a government construction contract that required the general contractor to promptly pay all workers were third-party beneficiaries to that contract under Illinois law, which at the time followed the First Restatement. *See Avco Delta*, 484 F.2d at 702. As discussed above, however, Maryland courts have clearly stated that to be a third-party beneficiary, the third party must be the "primary party in interest" and the contractual provision must have been "inserted to benefit the third party." *Towers II*, 56 A.3d at 212, 213 (alteration omitted) (quoting *Lovell Land*, 969 A.2d at 298). "It is not enough that the contract merely operates to an individual's benefit." *Id.* at 212. Similarly, *Beverly* addressed a scenario in which the promisee to the contract may have been motivated not just by an intent to benefit the third party but also by its own economic interests. *Beverly*, 702 F.2d at 941. Where Maryland law requires consideration of the intent of the parties, not just the promisee, and a third-party beneficiary must be the primary party in interest to the contract provision, *see Towers II*, 56 A.3d at 213, the existence of the Unions' secondary motivation of benefiting non-union workers is not enough to transform Plaintiffs into third-party beneficiaries.

Finally, the cases cited by Plaintiffs in the context of public prevailing-wage projects do not persuade the Court differently. In each of those cases, a government entity entered into a contract with a company that required the company to pay its employees according to certain specifications, *e.g.*, *H.B. Deal & Co. v. Head*, 251 S.W.2d 1017, 1020 (Ark. 1952); *Amaral v. Cintas Corp. No. 2*, 78 Cal. Rptr. 3d 572, 581, 600–01 (Cal. Ct. App. 2008), or a contractor entered into an agreement with a government entity that was subject to statutory prevailing wage requirements, *United States ex rel. Johnson v. Morley Constr. Co.*, 98 F.2d 781, 788 (2d Cir. 1938). The courts uniformly held that the employees of the contractor or subcontractor, which had signed the contract containing the wage requirements, were third-party beneficiaries with standing to enforce the contract. *E.g.*, *Morley Constr. Co.*, 98 F.2d at 788–89; *Head*, 251 S.W.2d at 1020; *Amaral*, 78 Cal. Rptr. 3d at 601. The government entity "undertook to see that laborers received full wages without subterfuge" and "placed the [relevant] provision in the contract for the benefit of the workers." *H. B. Deal & Co. v. Marlin*, 193 S.W.2d 315, 317 (Ark. 1946). Unlike the employers in *Morley*, *Marlin*, *Head*, and *Amaral*, Schuster neither was a signatory to the PLA nor signed a letter of assent and therefore was not a party to the contract that specified the wage requirements. None of these contracts had the primary, alternative motivation of benefiting the Unions and their members by keeping wage rates higher for the overall Project. Thus, the fact that contracts were found to have been entered into for the benefit of the employees of the contracting party does not establish that the PLA was intended to benefit the employees of a non-party employer.

For these reasons, the Court concludes that Plaintiffs are not third-party beneficiaries to the PLA. Their Motion will be denied, and Defendants' Motions will be granted as to Count I of the Amended Complaint.

### III.  Breach of Contract

In ruling on Plaintiffs' Motion to Remand and Defendants' Motions to Dismiss, the Court previously found that Plaintiffs' claims were preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (2012), and that the Maryland common law breach of contract claim is properly construed as a breach of a labor agreement claim pursuant to section 301. *See Singh v. Prudential Health Care Plan, Inc.*, 335 F.3d 278, 292 (4th Cir. 2003) (holding that "completely preempted claims" under the LMRA are "conver[ted] into federal claims" that "must . . . be decided by the district court"). Since "such an action closely resembles an action for breach of contract cognizable at common law," Maryland state law regarding breach of contract claims governs. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), AFL–CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705 n.7 (1966); *see Adams v. Am. Fed'n of State, Cty., & Mun. Emps.*, 167 F. Supp. 3d 730, 742 (D. Md. 2016). Under Maryland law, to "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001); *see also DeCohen v. Capital One, N.A.*, 703 F.3d 216, 227–28 (4th Cir. 2012) (finding that the plaintiff stated a claim for breach of contract under Maryland law where he showed an obligation owed to him and that such obligation was breached). Damages need not be proven. *Taylor*, 776 A.2d at 651.

Since the Court has held that Plaintiffs are not third-party beneficiaries to the PLA, they do not have standing to enforce the contract, and they have no rights against Defendants. *See Towers II*, 56 A.3d at 213. Therefore, Plaintiffs' Motion will be denied, and Defendants' Motions will be granted as to Count II of the Amended Complaint.

## IV. State Wage Claims

The MWHL requires that covered employees receive overtime pay of one and one-half times their regular pay rate. *See* Md. Code Ann., Lab. & Empl. § 3–415(a). A violation of the MWPCL occurs when an employer fails to pay "all wages due for work that the employee performed before the termination of employment," including overtime pay and fringe benefits. *Id.* § 3–505(a); *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625–26 (Md. 2014) ("[B]oth the [M]WHL and the [M]WPCL are vehicles for recovering overtime wages."). A breach of an employment agreement can constitute a breach of the MWHL and MWPCL. *See Battaglia v. Clinical Perfusionists, Inc.*, 658 A.2d 680, 683, 685 (Md. 1995); *Programmers' Consortium, Inc. v. Clark*, 951 A.2d 914, 919 & n.1 (Md. Ct. Spec. App. 2008).

Plaintiffs assert a MWHL claim on behalf of the Carpenter Class only and a MWPCL claim on behalf of both classes. Plaintiffs assert that Schuster violated the MWHL and MWPCL because its "violation of the requirements of section 12.5 of the PLA also constituted violations of the MWPCL and MWHL." Pls. Cross-Mot. Summ. J. 33. To the extent that Plaintiffs' state wage claims are premised on the requirements of the PLA and any violation by Schuster of the PLA's requirements for either the Carpenter Class or the Overtime Fringe Benefit Class, the Court has held that Plaintiffs cannot enforce a breach of contract claim based on the PLA. Accordingly, even assuming that the MWHL and the MWPCL claims arising from alleged violations of the PLA are not preempted by federal labor policy, they fail as a matter of law.

Plaintiffs also argue that the MWPCL claims brought on behalf of the Carpenter Class and Overtime Fringe Benefit Class are alternatively premised on alleged violations of the requirements of the Project Manual. Under the MWPCL, an employer is required to pay an employee all wages, including fringe benefit, that it "promised" to pay. *Whiting-Turner Contracting Co. v. Fitzpatrick,*

783 A.2d 667, 671–72 (Md. 2001). Although Schuster disavows any specific promises, it acknowledges that for work on the Project, it agreed to pay the rates contained in the Project Manual. Where employees were told that they would be paid at "scale" for work on the Project, which in this context is a clear reference to the rates in the Project Manual, Schuster was required by the MWPCL to pay Plaintiffs the wages and fringe benefits it agreed to pay in the Project Manual.

The Project Manual lists, for every work classification, a Basic Hourly Rate and a Fringe Benefit Payment. The Project Manual does not specify whether the Fringe Benefit Payment is to be paid for each hour worked, or whether it would be paid for overtime hours as well as regular hours. It states that the listed rates "were voluntarily adopted" and "were derived from those listed in the Department of Labor Licensing and Regulation, Informational Wage Rates for Prince George's County," but also states that "[t]his Project is not subject to State law regarding the payment of prevailing wages or the Davis-Bacon Act." J.R. 00146.

Plaintiffs' theory of Schuster's liability based on the Project Manual is based on the claim that "Maryland prevailing-wage law—as interpreted and enforced by the DLLR—requires payment of fringe benefits for all hours worked" and that Schuster was aware of this requirement from other projects subject to the Maryland prevailing wage law and the Davis-Bacon Act. Pls. Cross-Mot. Summ. J. 29. They also argue that these same legal provisions require higher payments to the Carpenter Class, such as a requirement that all work conducted by a carpenter be paid at the carpenter rate, even if the work constituted general labor. However, where the Project Manual not only fails to explicitly incorporate the requirements of the Maryland prevailing wage law, but actually specifically disavows the applicability of the Maryland prevailing wage law to the Project, the Court cannot find that Schuster's agreement to the pay scale in the Project Manual constitutes

a promise to pay in accordance with such requirements. Furthermore, Plaintiffs have not identified any other state law requirement, separate and apart from the PLA or the Maryland prevailing wage law, that any promise to pay fringe benefit payments necessarily constitutes a promise to make such payments on overtime hours.

There remains the question whether, separate from any reliance on the prevailing wage law, the plain language of the Project Manual reveals a promise by Schuster to make the payments sought by the Carpenter Class and the Overtime Fringe Benefit Class. Standing alone, the Project Manual cannot be read as a promise by Schuster to pay workers engaged in labor work at the carpenter rate if they are generally classified as carpenters. Moreover, the Project Manual does not state whether the "Fringe Benefit Payment" is to be paid on overtime hours. Even if that provision were to be deemed ambiguous such that the Court could consider extrinsic evidence on its meaning, it is notable that the DLLR has not consistently required fringe benefit payments to be made on all overtime hours on projects subject to the Maryland prevailing wage law. In fact, when ordering employers who did not comply with the prevailing wage law to pay restitution to their workers, for more than five years the DLLR used calculations that did not require employers to make fringe benefit payments on overtime hours worked. Where the evidence does not establish a common understanding that the mere inclusion of a fringe benefit payment rate necessarily signifies that it must be paid on overtime hours, the Court does not read the language of the Project Manual to contain a promise to pay fringe benefit payments on overtime hours.

Plaintiffs' Motion will therefore be denied, and Schuster's Motion will be granted as to Counts III and IV.

## V.     Unjust Enrichment

Schuster argues that Plaintiffs' unjust enrichment claims are barred because each Plaintiff's compensation was governed by an individual employment contract with Schuster. Specifically, Schuster claims that the individual Referral Sheets and related documents for Amaya, Gonzalez, and Castillo, as explained in the affidavit of Schuster CFO Lorraine Burns, establish that each Plaintiff had an individual employment contract with Schuster that would preclude an unjust enrichment claim. In the alternative, Schuster asserts that since Plaintiffs were fully compensated for their work, Schuster was not unjustly enriched. Plaintiffs contend that the hiring documents do not amount to an express contract, and even if they do, they are void because they provide for payment below the prevailing wage under Maryland law.

To state a claim for unjust enrichment under Maryland law, the plaintiff must allege that the defendant received a benefit from the plaintiff, that the defendant had knowledge of the benefit, and that the acceptance or retention of the benefit without payment would be inequitable. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007). A plaintiff cannot bring a claim for unjust enrichment when the substance of the dispute with the defendant is governed by an express contract. *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008). Contracts "must express with definiteness and certainty the nature and extent of the parties' obligations." *Kiley v. First Nat'l Bank of Md.*, 649 A.2d 1145, 1152 (Md. Ct. Spec. App. 1994) (citing *Canaras v. Lift Truck Servs.*, 322 A.2d 866, 871 (Md. 1974)). To be contractual under Maryland law, employment-related pronouncements must make a commitment to provide a "specific and definite benefit" to the person to whom the offer is made. *See MacGill v. Blue Cross of Md., Inc.*, 551 A.2d 501, 503–04 (Md. Ct. Spec. App. 1989).

The Court does not conclude that Schuster has established that it had express employment contracts with Plaintiffs. First, neither the Referral Sheets nor any other documents were signed by both the relevant Plaintiff and a Schuster representative so as to constitute an executed, express contract. There is no indication that Plaintiffs ever saw or knew of the unsigned hiring checklists. While Plaintiffs have acknowledged completing job applications, they were not signed by both parties, and Schuster has not even provided those applications to the Court.

To the extent that Schuster argues that Burns's description in her affidavit of Schuster's hiring procedures and the documents generated in that process establish the existence of some kind of binding, oral employment contract, that argument is unconvincing. Although Burns described the general hiring process and made assumptions from the Referral Sheets about what occurred when Plaintiffs were hired, she was not present when Plaintiffs filled out their applications and were actually hired at Schuster's office. While Schuster offered an affidavit from Sulmy Contreras, a Schuster administrative assistant and employee liaison whom Amaya stated was present when he applied for the position at the Project, Contreras did not state that she actually negotiated a contract with Amaya or any other employee and instead asserted only that she "was always available to serve as a translator as needed" when prospective employees filled out job applications with Schuster. J.R. 0150. Indeed, where Schuster acknowledges that the pay figures in the Referral Sheets related to work performed on projects other than the MGM Project, it cannot fairly claim that those documents formed the basis of an employment contract relating to work on the Project itself.

Significantly, Plaintiffs dispute that they were hired and entered into employment contracts in the manner described by Burns. The Referral Sheets state that Amaya and Gonzalez were hired at a pay rate of $17 per hour and that Castillo was hired at a rate of $20 per hour. At the time of

their hires, however, Amaya believed that he would receive a salary of $35 per hour and has asserted that they did not discuss the terms on the Referral Sheet; Castillo was told that he would receive $26 per hour plus retirement benefits, which was to be set by a foreman after a few months; and Gonzalez expected an unspecified salary higher than $17 hour that would be established by his foreman later. All Plaintiffs agreed that a Schuster representative either filled out or helped them fill out their applications and could not remember the applications in any detail. Thus, at a minimum, there remain genuine issues of material fact on whether, as claimed by Burns, Plaintiffs actually approved the pay and other terms in the Referral Sheets. The Court therefore finds that Schuster has not established the existence of an express contract sufficiently definite as to the parties' contractual obligations to be enforceable as a matter of law. *See Kiley*, 649 A.2d at 1152.

As for whether a claim of unjust enrichment can succeed where Plaintiffs, in fact, were paid for their work, that question is for the factfinder. Based on Plaintiffs' testimony, they were arguably misled about how much they would be paid for their work on the Project, and there is a plausible argument that it would be unjust for Schuster to be allowed to benefit from paying lower wages to Plaintiffs on a project for which it was agreed that all workers would receive the prevailing wage rate. Where both the existence of a contract and the unjustness of the benefit to Schuster are questions of fact, the Court will deny the Motion as to Plaintiffs' unjust enrichment claim.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion will be DENIED, Whiting-Turner's Motion will be GRANTED, and Schuster's Motion will be GRANTED IN PART and DENIED IN PART. Schuster's Motion will be denied as to Plaintiffs' unjust enrichment claim and otherwise granted. A separate Order shall issue.

Date: August 19, 2019

THEODORE D. CHUANG
United States District Judge